UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                    :

UNITED STATES OF AMERICA,                       :

                -v-                                           :                        18-CR-887 (JMF)

JASON RHODES,                                  :               <u>OPINION AND ORDER</u>

                   Defendant.                      :

------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      It is well established that the Government may simultaneously conduct civil and criminal investigations of the same subject matter and that civil and criminal authorities may cooperate and share information when doing so. But the Due Process Clause of the Fifth Amendment imposes some limits on that cooperation. Most significantly, the Government exceeds those limits if it conducts a civil investigation solely for the purpose of advancing a criminal case. The question presented in this case is whether Defendant Jason Rhodes, criminally charged with various securities fraud offenses, is entitled to discovery of certain documents and communications between the Securities and Exchange Commission ("SEC") and the United States Attorney's Office ("USAO") to determine if his due process rights were violated. Based on Second Circuit precedent and an in camera review of evidence submitted by the Government, the Court concludes that Rhodes is not entitled to the discovery he seeks. Accordingly, and for the reasons that follow, his motion for discovery is denied.

## BACKGROUND

      Rhodes was not arrested until October 2018, *see* Docket No. 2, but the investigation resulting in his arrest dates back to at least December 2016. At or about that time, the USAO

began investigating a Ponzi-like scheme at a hedge fund called Sentinel Growth Fund Management LLC ("Sentinel"), which the Government alleges had been co-founded by Rhodes (who also served as its Chief Risk Officer) and Mark Varacchi. *See* Docket No. 1 ("Complaint" or "Compl.") ¶ 10; Docket No. 8 ("Indictment") ¶ 2; Docket No. 44-1 ("Kobre Decl.") ¶ 3. Almost immediately, the USAO obtained the cooperation of Varacchi, who — on February 1, 2017 — pleaded guilty to an information charging him with conspiracy, securities fraud, wire fraud in connection with the scheme to defraud Sentinel investors, and "a separate count of wire fraud in connection with a scheme to defraud investors in a different hedge fund." Docket No. 28 ("Spears Decl.") ¶¶ 7, 11; *see* Kobre Decl. ¶ 3; 17-CR-76 (NRB), Docket No. 2 ("Varacchi Information") ¶¶ 4, 6. On January 27, 2017, presumably based in part on Varacchi's cooperation, the Government arrested (pursuant to a criminal complaint) Stevens Simmons and Joseph Meli, both of whom had solicited investments for Sentinel. *See* Kobre Decl. ¶ 4; Spears Decl. ¶ 8. Approximately one month later, on February 23, 2017, Simmons and Meli were indicted by a grand jury, and in October 2017, they pleaded guilty. *See* Kobre Decl. ¶ 5; Spears Decl. ¶ 8; *see also* 17-CR-127 (KMW), Docket Nos. 1, 58, 92, 94. For reasons that are not clear, Rhodes — although almost certainly on the radar of the USAO as early as December 2016, *see* Kobre Decl. ¶ 3 — was neither charged nor arrested in that period.

Meanwhile, the SEC had launched its own investigation of Sentinel even before December 2016. *See id.* ¶ 2. On February 2, 2017, the day after Varacchi's guilty plea, the SEC filed a complaint against Varacchi and Sentinel. *See* Spears Decl. ¶ 12. Five days later, the SEC served Rhodes with a subpoena seeking documents and testimony concerning Sentinel, Varacchi, and others. *Id.* ¶ 13. The subpoena was accompanied by SEC Form 1662, which advised Rhodes that the SEC "often makes its files available to other government agencies, particularly

United States Attorneys," and that there was "a likelihood that information" he supplied would "be made available to such agencies where appropriate." Docket No. 42-1, at 3. The Form further advised Rhodes that any information he provided could "be used" against him in a criminal proceeding and that he could refuse, "in accordance with" the Fifth Amendment, "to give any information that may tend to incriminate" him. *Id.* at 2. In four productions made between February 2017 and May 2017, Rhodes disclosed to the SEC documents, including email and cellphone records, in response to the subpoena. Spears Decl. ¶ 14. On August 23, 3017, Rhodes appeared with counsel at the SEC to provide testimony. *Id.* ¶ 15. In response to the SEC's questions, he asserted his Fifth Amendment privilege against self-incrimination. *Id*. Thereafter, the SEC and Rhodes engaged in settlement discussions through in or about the summer of 2018, but did not reach any resolution. *See* Docket No. 42, at 3 & n.3. To date, the SEC has not brought any civil charges against Rhodes. *See* Spears Decl. ¶ 17.

Rhodes was finally arrested, pursuant to a criminal complaint, on October 16, 2018, and indicted on December 13, 2018. *Id.* ¶ 16. The indictment charges Rhodes with conspiracy, securities fraud, wire fraud, and investment adviser fraud, all related to his conduct at Sentinel. *See* Indictment ¶¶ 5-38. The charging documents relied on information gathered from: interviews with Varacchi and records obtained during the Government's investigation of him, *see* Compl. ¶¶ 16, 20-22, 27-28; emails sent to or from Varacchi, *see id.* ¶¶ 4, 21-22, 27-28; Indictment ¶¶ 19, 23, 26-28, 32; bank records, *see* Compl. ¶¶ 11 n.1, 18; Indictment ¶ 12; records from a brokerage firm and an interview with an employee at the brokerage firm, *see* Compl. ¶¶ 17, 19, 20; Indictment ¶¶ 12-13, 32; and emails provided by an investor, *see* Compl. ¶ 24; Indictment ¶ 23. The Complaint also referenced a "review of other e-mails," but does not specify which emails, *see* Compl. ¶ 21 n.5, and a review of unspecified account statements, *see*

*id.* ¶¶ 21 n.6, 25; and the Indictment relies on information from Rhodes's personal bank account, *see* Indictment ¶ 14. Finally, and most significant for present purposes, the Complaint quotes "[f]rom text messages produced by Jason Rhodes . . . to the SEC." Compl. ¶ 23.[1] The Indictment does not refer to those messages.

On March 1, 2019, Rhodes filed the present motion, seeking disclosure of "all documents concerning any coordination between the United States Attorney's Office and the SEC with respect to their investigations into the conduct underlying the allegations in this matter." Docket No. 29 ("Def. Mem."), at 8. He argued that the "material must be disclosed so that Mr. Rhodes can determine whether the government improperly used the SEC civil process to further its criminal investigation," *id.*, an inference he argued was supported by the fact that he was not arrested until October 2018 and that the criminal complaint relies on text messages he had produced to the SEC, *see* Spears Decl. ¶ 18; *see also* Compl. ¶ 23. The Government opposed the motion, mainly on the ground that Rhodes had failed to meet the standard required to entitle him to an evidentiary hearing. *See* Docket No. 32 ("Gov't Opp'n"), at 7-10.

The Court scheduled oral argument for May 16, 2019. *See* Docket Nos. 38, 39. Before and at oral argument, the Court urged the Government to submit an affidavit addressing the

---

[1] The relevant paragraph of the Complaint states in full:

> From text messages produced by JASON RHODES, the defendant, to the SEC, I have learned that on or about December 22, 2015, at approximately 5:48PM, RHODES and Steven Simmons engaged in the following text message exchange: Simmons sent a message to RHODES asking "anything new?" RHODES responded "Just pulled car into garage. Door is closing. Engine stil on [sic]." Simmons replied "Lol." RHODES then replied "zzz." Simmons responded "[Investor-3] agreed to another 100k for [a particular portfolio manager] . . . Pushing for wire tomorrow" to which RHODES replied "My garage has a leak."

Compl. ¶ 23.

relationship between the USAO and SEC investigations.  *See* Docket Nos. 38, 39; Docket No. 45 ("Tr."), at 12-15; *see also* Docket No. 47 ("Mem Op."), at 2.  In response, the Government submitted a declaration from Assistant United States Attorney Elisha J. Kobre on May 17, 2019.  Mem. Op. 2; *see* Kobre Decl. ¶ 1.  For the reasons stated in a Memorandum Opinion and Order entered on June 18, 2019, however, the Court found AUSA Kobre's declaration lacking.  As the Court explained, the declaration did "nothing to advance the ball" because its representations were "conspicuously limited to" AUSA Kobre and said "nothing about the knowledge or involvement of others in the United States Attorney's office or law enforcement officers involved in the criminal investigation."  Mem. Op. 2.  Accordingly, the Court concluded that the Government "should be required to make a more substantial showing in camera," and ordered the Government to "submit another affidavit — to be reviewed in camera — detailing, with specificity, the nature and extent of any and all communications between the SEC and those involved in the criminal investigation of Rhodes" and attaching "copies of any such substantive communications."  *See id.* at 2-3.  On July 1, 2019, in response to the Court's order, AUSA Kobre submitted another declaration, with exhibits, for the Court's review.  *See* Docket No. 48; July 1, 2019 Declaration of Elisha J. Kobre, Assistant United States Attorney ("Kobre 2d Decl.") ¶ 1.[2]  AUSA Kobre's second declaration states unambiguously that neither he nor any other

---

[2]   In accordance with the Second Circuit's approach in *Gel Spice*, the Court finds that AUSA Kobre's second declaration and the exhibits thereto were properly submitted ex parte and under seal — and they will be maintained as such insofar as their disclosure would reveal information to which Rhodes (and the public) is not entitled.  *See Gel Spice*, 773 F.2d at 434 (noting that the Federal Rules of Civil Procedure "permit[] an ex parte showing when a party seeks to prevent the inspection of documents that are alleged to be confidential" and "permit[] a court to excise privileged matters from inspection by the defendants").  For the purpose of deciding the present motion, however, the Court finds that the probative value of quoting or characterizing certain portions of the sealed materials outweighs any prejudice to the Government.

5

member of the criminal prosecution team (comprised of both FBI agents and lawyers) "directed or requested the issuance of the [SEC] Subpoena" to Rhodes; "had any role in formulating the content of the Subpoena"; or "was aware that the SEC had issued the Subpoena until sometime after it was issued." Kobre 2d Decl. ¶ 13.

Additionally, AUSA Kobre's second declaration and the exhibits thereto reveal or confirm that: (1) the SEC investigation into Sentinel and Rhodes predated the USAO's investigation, *see id.* ¶¶ 3-4; Kobre 2d Decl., Exhibit A ("Ex. A"), at 106; (2) on May 17, 2017, AUSA Kobre first requested (and later received) the information that Rhodes had provided in response to the SEC's subpoena, *see* Kobre 2d Decl. ¶ 16(c); Ex. A, at 412; (3) in February 2018, AUSA Kobre first requested (and later received) a transcript of Rhodes's August 2017 testimony before the SEC, *see* Kobre 2d Decl. ¶ 16(d); Ex. A, at 316; (4) in or about the spring of 2018, a lawyer at the SEC advised AUSA Kobre that the SEC was engaged in settlement discussions with Rhodes (through his counsel) and inquired whether and when the USAO might charge Rhodes, *see* Kobre 2d Decl. ¶ 16(e); *see also* Ex. A, at 286-87, 289; (5) in the summer or fall of 2018, AUSA Kobre told the lawyer at the SEC that the USAO "was likely to seek charges against Rhodes," at which point the SEC lawyer advised that Rhodes had not responded to the SEC's proposed settlement and that, in light of the likely criminal charges, the SEC "was not going to pursue" settlement with Rhodes further, *see* Kobre 2d Decl. ¶ 16(h); and (6) between December 2016 and April 2019, the criminal prosecution team and the SEC shared documents with each other, pursuant to formal requests and subject to explicit conditions imposed by the sharing agencies. *See* Ex. A, at 651-53, 655-59; Kobre 2d Decl., Exhibit D ("Ex. D"), at 18-22; *see also, e.g.*, Ex. A, at 2-4, 8 (SEC sharing documents with USAO), 145-47 (USAO sharing documents with SEC), 241 (SEC sharing documents with USAO), 278-80 (same), 316 (SEC

sharing "investigative testimony transcript of Jason Rhodes" and "testimony exhibits" with USAO), 333-34 (SEC sharing documents with USAO), 392 (same), 399 (same), 602 (same).

## DISCUSSION

It is well established that the Government may conduct simultaneous criminal and civil investigations of the same targets and subject matters. "Nothing in the Constitution forbids contemporaneous civil and criminal proceedings concerning the same subject matter." *Nosik v. Singe*, 40 F.3d 592, 596 (2d Cir. 1994) (citing *United States v. Kordel*, 397 U.S. 1, 11 (1970)); *see also United States v. Gel Spice Co.*, 773 F.2d 427, 434 (2d Cir. 1985) ("Civil and criminal enforcement may proceed simultaneously."). Moreover, "there is no general rule" prohibiting a civil enforcement agency such as the SEC from "sharing . . . evidence acquired through civil discovery with criminal prosecutors." *United States v. Fiore*, 381 F.3d 89, 94 (2d Cir. 2004) (citing *SEC v. Dresser Indus.*, 628 F.2d 1368, 1385 (D.C. Cir. 1980) (en banc)); *accord Gel Spice Co.*, 773 F.2d at 434. Indeed, because "[s]ecurities fraud is a proper subject of both administrative and criminal investigations . . . SEC enforcement officials and prosecutors all expect coordination at some investigative level and perceive the various proceedings as integral to each other." *Fiore*, 381 F.3d at 94. Thus, the fact that — as the Complaint reveals, *see* Compl. ¶ 23, and AUSA Kobre's second declaration confirms, *see* Kobre 2d Decl. — there was coordination and sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and the SEC, on the other, is, in itself, unexceptional and unproblematic.

That said, it is equally well established that there are some due process limitations on the coordination of civil and criminal investigations. In *Kordel*, for example, the Supreme Court observed that a defendant's due process rights may be violated if the Government "brought a civil action solely to obtain evidence for its criminal prosecution or . . . failed to advise the

7

defendant in its civil proceeding that it contemplates his criminal prosecution." *Kordel*, 397 U.S. at 11-12.  Similarly, in *United States v. LaSalle National Bank*, 437 U.S. 298 (1978), the Supreme Court held that the Internal Revenue Service ("IRS") must issue civil summonses in good faith and, *a fortiori*, cannot act as "an information-gathering agency for other departments, including the Department of Justice." *Id.* at 316-17.  Following *Kordel* and *LaSalle National Bank*, courts have "occasionally suppressed evidence or dismissed indictments on due process grounds where the government made affirmative misrepresentations or conducted a civil investigation solely for purposes of advancing a criminal case." *United States v. Stringer*, 535 F.3d 929, 937 (9th Cir. 2008) ("*Stringer II*") (citing cases).

But the question here is not whether Rhodes has shown that the dual investigations infringed his due process rights.  Instead, the question is whether he is entitled to additional discovery in service of making such a showing.  Def. Mem. 8; *see, e.g.*, *Dresser*, 628 F.2d at 1374 (seeking, in part, "to obtain discovery from the SEC concerning the agency's alleged bad faith" related to a dual investigation).  Analogizing the issue to a selective prosecution claim, Rhodes contends that he is entitled to such discovery if there is "'some evidence tending to show the existence' of the essential elements of the claim." Docket No. 37, at 4-5 (quoting *United States v. Armstrong*, 517 U.S. 456, 469 (1996)).  The Government, by contrast, argues that the standard for an evidentiary hearing applies, thus requiring Rhodes to make a "'sufficiently definite, specific, detailed, and nonconjectural'" showing to establish that "contested issues of fact . . . are in question.'" Gov't Opp'n 8 (quoting *United States v. Mahaffy*, 446 F. Supp. 2d 115, 127 (E.D.N.Y. 2006)).  But in making these arguments, both parties overlook that the Second Circuit squarely addressed the relevant standard for such discovery in *Gel Spice* and that that decision remains good law.  *See Gel Spice*, 773 F.2d at 434; *see also United States v.*

8

*Hossaini*, 407 F. App'x 556, 559 (2d Cir. 2011) (summary order) (citing *Gel Spice*); *United States v. Astrup*, 189 F. App'x 11, 14 (2d Cir. 2006) (summary order) (same).

*Gel Spice* involved multiple investigations by the Food and Drug Administration ("FDA") of the spice factory run by the Gel Spice Company. *See Gel Spice*, 773 F.2d at 429-30. At some time after the first investigation, the FDA considered a criminal prosecution against Gel Spice; after several more investigations, the agency referred the matter to the United States Attorney's Office, which charged Gel Spice criminally. *See id.* at 430-31. Gel Spice filed a motion to suppress evidence of the investigations and to dismiss the criminal case, arguing that "the government had obtained the evidence underlying the information in bad faith by using a civil administrative proceeding to obtain evidence for a criminal prosecution." *Id.* at 431. In response, the Government — apparently voluntarily — submitted declarations from FDA personnel (and a Government proffer containing statements by additional FDA personnel) explaining the timelines of the civil and criminal investigations. *See id.* at 431-32. The assigned Magistrate Judge reviewed the declarations and "internal FDA memoranda" submitted in camera and, after some back and forth, decided that Gel Spice was not entitled to an evidentiary hearing because "it had failed to make a substantial preliminary showing of bad faith." *Id.* (internal quotation marks omitted). On appeal, the Second Circuit affirmed. It agreed that a defendant must "make a substantial preliminary showing of bad faith before an evidentiary hearing or even limited discovery" on the issue of bad faith is to be granted. *Gel Spice*, 773 F.2d at 434 (internal quotation marks omitted). It also agreed that "Gel Spice failed to make a substantial preliminary showing of bad faith" — in part because a declaration from an FDA compliance officer "adequately explained" the allegedly suspicious timeline. *Id.*

This case involves the exact issue decided in *Gel Spice*: what showing a defendant must make in order to obtain discovery regarding parallel criminal and civil investigations. Thus, notwithstanding Rhodes's protestations to the contrary, the *Gel Spice* standard plainly applies. As Rhodes points out, however, the Magistrate Judge and the Second Circuit applied the "substantial preliminary showing" standard in *Gel Spice* only *after* the FDA had provided declarations explaining the circumstances of the investigation and internal documents for an in camera review. *See* Docket No. 43, at 2 (citing *Gel Spice*, 773 F.2d at 430-32); Tr. 11. In fact, as noted, the Second Circuit explicitly relied on one of those declarations in affirming that the defendant had not made a substantial preliminary showing of bad faith. *See Gel Spice*, 773 F.2d at 434. Notably, other courts addressing the issue have similarly examined declarations from government employees or reviewed evidence in camera before ruling on motions for relief. *See, e.g.*, *United States v. Posada Carriles*, 541 F.3d 344, 351 (5th Cir. 2008) (noting that the district court had conducted an in camera review of the agency's evidence); *Astrup*, 189 F. App'x at 13-14 (affirming the denial of an evidentiary hearing based in part on "the strength of the government's submission," which included an "affidavit of the investigating IRS officer"); *Mahaffy*, 446 F. Supp. 2d at 126 (citing an affidavit about the investigation from a branch chief at the SEC); *see also United States v. Stringer*, 408 F. Supp. 2d 1083, 1084-85 (D. Or. 2006) (holding a multi-day hearing on a motion to suppress raising this issue), *rev'd*, *Stringer II*, 535 F.3d 932. Mindful of these cases and the larger context for the Second Circuit's articulation of the standard in *Gel Spice*, the Court ordered the Government to "submit [an] affidavit . . . detailing, with specificity, the nature and extent of any and all communications between the SEC and those involved in the criminal investigation of Rhodes" and attaching "copies of any such

substantive communications." Mem. Op. 2-3. As previously noted, the Government submitted AUSA Kobre's second declaration in response. *See* Docket No. 48; Kobre 2d Decl.

Having now reviewed entire record, including AUSA Kobre's second declaration and the exhibits thereto, the Court concludes that Rhodes has not made the requisite substantial preliminary showing of bad faith and, thus, is not entitled to further discovery. As an initial matter, Rhodes does not seriously argue that the Government engaged in bad faith by hiding the possibility of a criminal investigation from him. *See, e.g.*, *Kordel*, 397 U.S. at 11-12. That is for good reason, as the evidence is undisputed that (1) the SEC included a copy of Form 1662 — which explicitly warns that information may be used in connection with a criminal prosecution — with Rhodes's subpoena, *see* Docket Nos. 42, 42-1; *see, e.g.*, *Stringer II*, 535 F.3d at 934; (2) three of Rhodes's co-conspirators had been criminally charged by the time the SEC subpoenaed Rhodes, *see* Spears Decl. ¶¶ 8, 11, 13; and (3) Rhodes invoked his Fifth Amendment privilege against self-incrimination — meaning that he was aware of the possibility of criminal charges — when he appeared at the SEC to give testimony, *see id.* ¶ 15. Thus, whether he is entitled to further discovery with respect to communications and coordination between the SEC and the USAO turns on whether he has made a substantial preliminary showing of bad faith — that is, as applied to the facts here, a substantial preliminary showing that the Government conducted the civil investigation "solely" to assist the criminal one. *See Kordel*, 397 U.S. at 11-12.

The Court concludes that Rhodes fails to make such a showing for several reasons. First, and most crucially, AUSA Kobre has now declared, under penalty of perjury, that neither he, nor any other member of the criminal prosecution team, directed or requested the issuance of the

SEC subpoena. *See* Kobre 2d Decl. ¶ 13.[3] By itself, that unambiguous statement refutes any suggestion that the SEC issued the subpoena, or gathered documents pursuant to it, solely (or even partly) to further the criminal investigation. *Cf.* Def Mem. 9-11. Second, the SEC's investigation of Sentinel and Rhodes predated the USAO's, which "tends to negate any likelihood that the government began the civil investigation in bad faith, as, for example, in order to obtain evidence for a criminal prosecution." *Stringer II*, 535 F.3d at 939. Third, the record reveals that the SEC issued its subpoena to Rhodes "just after [its] investigation went overt," Tr. 18-19; *see also* Spears Decl. ¶ 12 (SEC filed complaint on February 2, 2017); *id.* ¶ 13 (SEC subpoenaed Rhodes on February 7, 2017), suggesting that the SEC investigation and subpoena were closely connected. Fourth, the SEC did not immediately funnel to the USAO evidence it obtained with respect to Rhodes, as one would expect if the SEC was simply doing the USAO's bidding. Instead, the SEC transmitted information only when requested by the USAO — in many instances, months after the SEC had obtained it. Most significant, the record reveals that the USAO did not request, and the SEC did not provide, a transcript of Rhodes's testimony before the SEC until February 2018 — nearly *six months* after it occurred. *See id.* ¶ 16(d); *see also* Ex. A, at 316. Fifth, the sharing of information between the criminal prosecution team and the SEC went in both directions — undermining any notion that the SEC was conducting its investigation solely to assist the USAO. *See, e.g.*, Ex. A, at 145, 147 (USAO sending materials to SEC); Ex. D, at 18 (FBI sending materials to SEC). What's more, that sharing occurred pursuant to formal requests and subject to explicit conditions mandated by the sharing agencies. *See* Ex. A, at 651-53, 655-59; Ex. D, at 18-22. And finally, the emails between the SEC and the

---

[3] Indeed, AUSA Kobre notes that, "[t]o the best of [his] knowledge," he had not seen a copy of the subpoena until April 2019, after this Court scheduled oral argument on Rhodes's motion. Kobre 2d Decl. ¶ 16(j); *see also* Ex. A, at 11.

criminal prosecution team include nothing to suggest that the SEC conducted its investigation solely to assist the USAO in obtaining evidence for use in its criminal case or that there were improper discussions about the USAO's decision to criminally prosecute Rhodes.

Admittedly, on the current record, there is one mystery that remains unsolved — namely, why the SEC, despite its extensive investigation of, and settlement discussions with, Rhodes, has not brought civil fraud charges against him. *See* Kobre Decl. ¶ 6; Docket No. 42, at 3 & n.3.[4] In many respects, that is the primary (and perhaps most substantial) foundation for Rhodes's suspicions of bad faith and his present motion. *See* Spears Decl. ¶ 17; *see also* Tr. 29-30. Had the SEC submitted an affidavit of its own, as the FDA did in *Gel Spice*, this mystery could easily have been dispelled. But the Court did not order the Government to obtain and submit such an affidavit (and the Government did not submit one unsolicited). And in the final analysis, when considered in light of the evidence discussed above, the absence of SEC charges alone does not support, let alone strongly, an inference that the SEC's civil investigation was conducted solely to advance the USAO's criminal investigation.

## CONCLUSION

For the foregoing reasons, the Court concludes that Rhodes has not made a substantial preliminary showing of bad faith and, thus, is not entitled to additional discovery regarding communications and coordination between the USAO and the SEC. Accordingly, Rhodes's

---

[4] In his second declaration, AUSA Kobre notes that he advised the SEC's counsel in the summer or fall of 2018 that the USAO "was likely to seek charges against Rhodes," and that the SEC's counsel indicated that Rhodes's lawyers "had not responded to a proposed settlement by the SEC and that," in light of the likelihood of criminal charges, "the SEC was not going to pursue Rhodes's counsel to follow up about the proposed settlement." Kobre 2d Decl. ¶ 16(h). That explains the absence of further settlement talks; it does not, of course, explain the absence of SEC charges.

13

motion seeking such discovery is DENIED.[5]  The Clerk of Court is directed to terminate Docket No. 23.

SO ORDERED.

Dated: July 16, 2019
      New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[5] Rhodes's motion also sought the disclosure of exculpatory and impeachment material. *See* Docket No. 23; Mem. Op. 2-8.  The Court denied that portion of the motion from the bench on May 16, 2019.  *See* Docket No. 45, at 2-3.