UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

JASON RHODES,

Defendant.

18-Cr-887 (SHS)

MEMORANDUM ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

On April 13 and 14, this Court held a two-day *Fatico* hearing on several contested issues of fact affecting defendant Jason Rhodes's applicable United States Sentencing Guidelines ("U.S.S.G.") range. (*See* Tr., ECF Nos. 125, 127.) The Court heard testimony from two witnesses: Mark Varacchi, with whom Rhodes co-founded Sentinel Growth Fund Management, and Laurence Freed, a summary witness with the Brattle Group.

At a high level, Rhodes disputes the extent of his participation in Sentinel's fraudulent scheme: he claims, in essence, that Varacchi was the operation's ringleader, and that despite Rhodes's role as Sentinel's co-founder, Chief Investment Officer and Chief Compliance Officer, he was, for much of Sentinel's existence, an unwitting party to its illegal, Ponzi-like activities.

More concretely, the parties dispute three aspects of Rhodes's Guidelines range, as calculated by the government in its *Pimentel* letter, as well as by the U.S. Probation Office in its Presentence Investigation Report. ("PSR," ECF No. 101.) In particular, the calculations at issue are:

1) A 20-point enhancement for a loss amount between $9.5 million and $25 million;
2) A 2-point enhancement for an offense involving 10 or more victims; and
3) A 2-to-4-point mitigating role reduction.

(Def. Mem. at 2, ECF No. 131.) The parties also previously disputed the applicability of a 2-point enhancement for sophisticated means, a 4-point investment-advisor enhancement, and a 2-point reduction for acceptance of responsibility. Rhodes has withdrawn his objections to these two enhancements (*id.* at 2 n.1), and the government now agrees that a downward adjustment for acceptance of responsibility is appropriate (Gov't Mem. at 17, ECF No. 135).

After considering the evidence and the parties' post-hearing briefing, the Court finds that Rhodes's objections have no merit, and that a Guidelines range of 135-168 months' imprisonment is accurate.

## I. Loss Amount

The PSR makes inconsistent calculations regarding loss amount: at one point, it states that a 22-point enhancement for a loss amount between $25 million and $65 million applies, whereas elsewhere, it indicates that a 20-point enhancement for a loss amount between $9.5 million and $25 million is appropriate. (*Compare* PSR ¶ 39, *with* PSR p. 19.) The government has provided evidence indicating a total loss to Sentinel's victims of slightly more than $25 million (*see, e.g.*, GX 8005B), but it has consistently argued that this number is close enough to the cutoff point to warrant rounding down to a 20-point enhancement (*see, e.g.*, Gov't Mem. at 13 n.11). Rhodes, for his part, argues that the Court should base its loss calculation pursuant to U.S.S.G. § 2B1.1 not on the loss his fraudulent conduct caused at all, but instead on the gain he realized from his criminal activities: $328,934, which would warrant only a 12-point enhancement. (*See* Def. Mem. at 3.)

The Sentencing Guidelines define loss under section 2B1.1(b)(1) as the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n. 3(A)(i). The Guidelines provide that "[t]he court need only make a reasonable estimate of the loss," and note that "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id.* cmt. n. 3(C); *see United States v. Norman*, 776 F.3d 67, 79 (2d Cir. 2015) ("The sentencing court is not required to calculate the amount of loss with certainty or precision[.]"). The Guidelines also establish that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss *only* if there is a loss but it reasonably cannot be determined." *Id.* cmt. n. 3(B).

Rhodes argues that the loss "reasonably cannot be determined" here because the government "did not produce any evidence of timing—that is, when . . . Rhodes purportedly started to participate in Varacchi's fraud, what his specific agreement with Varacchi was at any given point in time, and whether the scope of that agreement included the particular losses claimed by the Government at any given point in time." (Def. Mot. at 4.) However, the evidence presented at the *Fatico* hearing clearly establishes Rhodes's knowing and active participation in the entire Sentinel fraud, and his consequent responsibility for more than $9.5 million in loss.

First, Rhodes's contention that he was unaware of Sentinel's fraudulent conduct from its 2013 founding until at least 2015 is simply not credible. Rhodes and Varacchi co-founded Sentinel as equal partners in 2013, with Rhodes serving as Chief Investment Officer and Chief Compliance Officer. (*See* Tr. 9, 18.) The two were close friends, and they sat six feet apart from each other in the same office. (Tr. 130-131.) More importantly, *only* Rhodes had authority to redeem investor funds from Weeden, Sentinel's prime broker. (*See* Tr. 27-28; GX-1010.) And although Varacchi would

2

sometimes forge Rhodes's signature on redemption forms (Tr. 33-43), he could not have done so without Rhodes's knowledge and participation: Rhodes was copied on the e-mails submitting these forms, and Rhodes received a phone call from Weeden to confirm each redemption request after it was received (*see* Tr. 30; GX-6000).

As CIO, Rhodes surely knew that Sentinel was unprofitable from its onset. (*See* GX-8011-A-C.) He also surely knew that, per the terms of Sentinel's private placement memoranda with investors, Sentinel was entitled to only a small management fee, in addition to a contingent performance fee based on these non-existent profits. Nonetheless, from 2013 through 2016, Rhodes signed off on every fraudulent "redemption" of investor funds, funds that Sentinel had no legal right or permission to withdraw. (*See, e.g.*, GX-8002, 8005-B, 8006, 8007-A, 8007-B; Tr. 80-83.) The fact that more of these misappropriated funds accrued to Varacchi's benefit than to Rhodes's benefit is immaterial to Rhodes's clear knowledge of, and participation in, these illegal withdrawals. (*See* Tr. 43-44.)

Moreover, from the start, Rhodes himself *did* benefit from these illegal disbursements. In November 2013, soon after Sentinel's founding, Rhodes submitted a $250,000 redemption request; the same day that request was received, $80,000 of those investor funds were rerouted into Rhodes's personal account, apparently in order to support an unrelated investment Rhodes had made in a trucking company. (Tr. 40-42; GX-101; GX-7004.)

Rhodes's claim of naïveté as to the criminal nature of Sentinel's activities further collapses in light of his preceding role in the so-called "Taran Fraud." In 2011 and 2012, immediately before founding Sentinel, Rhodes and Varacchi engaged in a joint scheme to defraud Taran, a different hedge fund for which Varacchi served as Chief Operating Officer. The two conspired to submit invoices to Taran for "risk management services" that Rhodes allegedly performed. In reality, no such services were ever provided, and Rhodes and Varacchi then split the proceeds of their fraudulent scheme. (Tr. 147-156; GX-150-186, GX-110, GX-120, GX 8014-A, GX-8014-B.) Rhodes and Varacchi thus built their relationship by defrauding a prior hedge fund, which squarely undermines Rhodes's purported ignorance of the fraudulent nature of the hedge fund the two later started together. Indeed, in 2016, Rhodes and Varacchi misappropriated Sentinel funds to settle a lawsuit brought by Taran for this prior fraud. (Tr. 156-166; GX-104, GX-3022.)

All this evidence speaks in one voice as to the timing and scope of Rhodes's participation in Sentinel's scheme: from the start, Rhodes was both an active, knowing participant in, and a direct beneficiary of, Sentinel's fraudulent misappropriation of investor funds.

Finally, even if the Court did not find Rhodes responsible—as it does—for the full duration and scope of Sentinel's fraud, the government has adduced evidence of

3

Rhodes's direct involvement in fraudulently misappropriating more than $9.5 million in victim funds in 2015 and 2016 alone. In those years, Rhodes played an active role in the misappropriation of more than $4 million in funds from Brett Crawford and Flatiron Partners (*see* Tr. 50-53; GX-2000, GX-7016, GX-7059); more than $4 million from A.L. Sarroff (Tr. 82-110; GX-206-223); approximately $5 million from GRTD, from whose funds Rhodes and Varacchi settled the Taran lawsuit (Tr. 155-166; GX-104, GX-3022); $1 million from MCEF Capital (Tr. 68-74; GX-7071); and nearly $1 million from the Dartley family (Tr. 122-128; GX-103, 104, 7045, 7046), among others. These funds alone total well over $9.5 million. During this period, as Sentinel's Ponzi-like activities spiraled out of control, Rhodes took deliberate, sophisticated steps to further and conceal Sentinel's fraud: conducting offsetting transactions with no economic substance other than to avoid a margin call (Tr. 64-68; GX-8009-A-F, 8010-B, E); using leverage to make investors' subaccounts appear well-funded, when in reality the entire fund was nearly insolvent (*compare* GX-7018, *with* GX-1054); forging account statements to reflect the balance investors believed they had, despite this insolvency (Tr. 88-96; GX-207-223, GX-9000); and creating false performance reports detailing the investment returns of alleged portfolio managers who, in reality, had never traded on the Sentinel platform (*see* Tr. 132-147, GX-7026, 7058, 7061-7066, 7072, 7077-7080).

Accordingly, the Court finds that the "reasonably foreseeable pecuniary harm that resulted from" Rhodes's fraudulent conduct exceeds $9.5 million. U.S.S.G. § 2B1.1 cmt. n. 3(A)(i). Rhodes's argument that this loss "reasonably cannot be determined," *id.* cmt. n. 3(C), and that the Court should thus substitute his significantly smaller gain of $328,934, has no merit. A 20-point enhancement is accordingly warranted.

## II. NUMBER OF VICTIMS & MINOR ROLE REDUCTION

For very similar reasons, Rhodes objects to the application of a 2-point enhancement for an offense involving 10 or more victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i). And for very similar reasons, this objection is overruled as well.

The Sentencing Guidelines define a "victim" as "any person who sustained any part of the actual loss determined under" the loss calculation. U.S.S.G. § 2B1.1 cmt. n. 1. As set forth above, Rhodes is responsible for the entire scope and duration of the Sentinel fraud. Accordingly, he is responsible for each individual and institutional investor who sustained any part of that loss. The government provided evidence of more than 30 victims who sustained losses attributable to Rhodes's conduct. (*See* GX-8005B.) And though Rhodes quibbles around the edges with the categorization of a couple of these investors (*see* Def. Mem. at 7; Tr. 142-146), there is no question that the offense involved far more than the 10 victims necessary to warrant the adjustment. Moreover, particularly when running a Ponzi scheme, money is fungible: as Sentinel approached insolvency in 2015-2016—at which time Rhodes was actively embezzling, misappropriating, and fabricating investor funds—his

4

activities harmed *all* Sentinel's investors, whose funds had long since been comingled in order to maintain the scheme. (Tr. 58-61, 125-126.)

Finally, Rhodes's argument that he is entitled to a 2-to-4-point mitigating role reduction is of no moment. Rhodes argues that because "Varacchi was the leader, organizer, and driving force of Sentinel and the fraud," and because Rhodes is "plainly the least culpable compared to" Varacchi and Steven Simmons, the Court should find him "substantially less culpable than the average participant" and entitled to a reduction pursuant to U.S.S.G. § 3B1.2.

Rhodes is in certain ways less culpable than Varacchi and Simmons, each of whom financially benefitted more from Sentinel's fraud than Rhodes. But this fact alone does not remotely entitle Rhodes, the co-founder, Chief Investment Officer, and Chief Compliance Officer of the fraudulent entity, to a minor-role reduction. The Sentencing Guidelines lay out five non-exhaustive factors relevant to the reduction's applicability:

"(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity."

U.S.S.G. § 3B1.2 cmt. n. 3(C)(i)-(v). For the reasons detailed above, all five of these factors militate strongly against applying the minor-role reduction to Rhodes. In his role as co-founder and CIO, Rhodes was required to approve every withdrawal of investor funds during Sentinel's existence. He had previously orchestrated the Taran fraud with Varacchi, and he personally benefitted from an $80,000 misappropriation of investor funds within months of Sentinel's founding. By 2015, he was directly orchestrating offsetting transactions, falsifying account statements, and fabricating performance reports. He manifestly understood the "scope and structure" of the criminal activity; "participated in planning [and] organizing the criminal activity"; and "exercised" *senior* "decision-making authority." And though he may have benefitted from Sentinel's fraud less than his co-founder, the more than $300,000 he *did* illegally withdraw for personal use was indeed substantial. A minor-role reduction is not warranted.

5

### III. CONCLUSION

Rhodes's objections to his Sentencing Guidelines range have no merit. A 20-point increase for loss greater than $9.5 million but less than $25 million is warranted, as is a 2-point increase for more than 10 victims. No minor-role reduction is warranted. The Court finds defendant's Total Offense Level is 33, Criminal History Category is I, and resulting Guidelines range is 135-168 months.

Dated: New York, New York
       July 7, 2021

SO ORDERED:

*[signature]*

Sidney H. Stein, U.S.D.J.